**Glenn STETSON, Plaintiff-Appellant,**

**v.**

**HOWARD D. WOLF & ASSOCIATES; Howard D. Wolf and Bob Duncan, Defendants-Appellees.**

**Docket 91-7896.**

United States Court of Appeals, Second Circuit.

Argued Nov. 7, 1991.

Decided Feb. 6, 1992.

MINER, Circuit Judge:

It sometimes is difficult even for an expert to distinguish between real diamonds and paste. We are called upon to identify the real Diamonds in a dispute between two competing vocal groups. Plaintiff-appellant Glenn Stetson appeals from a judgment entered in the United States District Court for the Southern District of New York (Martin, J.) declaring that defendants-appellees Howard D. Wolf & Associates, Howard D. Wolf, and Bob Duncan (collectively, the "Duncan Group") have the exclusive right to use the trade name and trademark "the Diamonds" for a singing group, and permanently enjoining plaintiff-appellant Stetson from future use of the name and mark. Stetson brought this action in an effort to have himself declared sole owner of the trade name used by his singing group. The district court found no merit in Stetson's assertion of legal title to the Diamonds name. In particular, the trial judge found that the trade name's original owner, Nathan D. Goodman, never abandoned the name and properly conveyed all interest in it to the Duncan Group's predecessors in interest.

Stetson argues on appeal that the district court, in determining his claim that Goodman abandoned the mark, should have applied the standard formulated in *Silverman v. CBS Inc.*, 870 F.2d 40 (2d Cir.1989). The Duncan Group contends that even under that test, the court reached the correct result. We believe the district court erred in failing to apply the standards set forth in *Silverman*, but find that even under the appropriate criteria the Duncan Group must prevail.

## BACKGROUND

The 1950's saw the rise of vocal quartets, with many groups becoming overnight sensations in the United States and selling millions of records. One such group, "the Diamonds," who hailed from Canada, scored several hit records during that period, including such classics as "Why Do Fools Fall In Love" and "Little Darlin'".

Robert J. Berman, New York City (Berman and Klein, of counsel), for plaintiff-appellant.

Allen Hyman, Pasadena, Cal. (Sheldon & Mak, of counsel), for defendants-appellees.

Before CARDAMONE and MINER,[*] Circuit Judges.

[*] Judge Kaufman, originally a member of the panel, died on February 1, 1992. The appeal is being decided by the remaining members of the panel pursuant to Local Rule § 0.14(b).

The original members of the group, Ted Kowalski, Phil Levitt, Bill Reed, and David Somerville (the "Original Diamonds"), recorded these hits and toured extensively. Nathan D. Goodman managed the group from its inception.

Several personnel changes occurred over time, and in 1958, when Goodman and the Diamonds entered into a new contract, the group consisted of Somerville, Mike Douglas, Evan Fisher, and John Felton. According to the new contract, Goodman was to serve as manager and representative for the band in all business dealings, and would have certain duties in connection with arranging music and staging the performances. More importantly, the contract provided that the four singers would not, "without the written consent of [Goodman] first obtained, use, nor cause to be used, nor in any way exploit the trade or professional name The Diamonds." A later partnership agreement in 1963, signed by Douglas, Fisher, Felton, and Somerville's replacement James Malone, reconfirmed Goodman's exclusive right to control and use the Diamonds trade name, as well as Goodman's managerial duties and royalty entitlements.

In 1967, the partnership dissolved. Under the terms of the dissolution agreement, the Diamonds name became the exclusive property of Goodman. Douglas, Fisher, Felton, and Malone continued to perform as the Diamonds pursuant to a license granted them by Goodman, with Goodman still acting as manager. Shortly after the execution of the dissolution agreement, Goodman began experiencing difficulties collecting from the singers the royalties due him, and the group refused to acquiesce to Goodman's management decisions on bookings and promotion. The singers attempted to revoke the dissolution agreement in 1968, and Goodman responded with a lawsuit requesting not only a declaration of his exclusive rights to the trade name, but also an injunction to force the group to comply with the management contract and license. Goodman also sought damages in the amount of the royalties owed him by the singers under the license and for his management of the group. Malone appar-

ently never was served with process, and Douglas and Fisher took so little interest in the case that their attorney eventually moved to be relieved of representing them. The litigation ended in February 1973 with a declaration that Goodman possessed sole ownership of the Diamonds trade name, a judgment by stipulation against Felton for royalties owed, and an injunction against future use of the trade name by Felton without Goodman's authorization. The other three who had signed the dissolution agreement but had not participated in the litigation had no judgments rendered specifically against them for monetary or injunctive relief.

For some of the time the lawsuit was pending, Douglas continued to lead a group called the Diamonds, which performed around the country without Goodman's imprimatur or acquiescence. It is this group that plaintiff-appellant Glenn Stetson joined, first in 1969 for a brief stint, then on a permanent basis in 1971. Douglas quit the Diamonds around June 1972, apparently turning the money from the last performance over to Stetson and saying "It's all yours." Stetson proceeded to lead the band, which continued to tour as the Diamonds. He applied for and received a service mark for the name from the United States Patent and Trademark Office in June 1974. The mark lapsed in 1980 due to Stetson's failure to file the requisite affidavit.

After the lawsuit, in late 1974 or early 1975, Goodman licensed the Diamonds trade name to Felton, who resumed touring under that billing. Thus, two competing groups, containing none of the Original Diamonds, toured the country at this time. In 1979, Felton hired Bob Duncan to join the group as a vocalist. When Felton died in an airplane crash in 1982, Duncan assumed leadership of the group, and contracted with Goodman for a license to use the Diamonds name. Duncan then assigned that license to Diamond Productions, Inc., which, in 1983, instituted suit against Goodman's son (as Goodman's heir) to enjoin his promotion of another version of this often reincarnated group. The case

ultimately settled, with Diamond Productions obtaining an assignment of all rights the Goodman family and estate possessed in the trade name. In 1984, Diamond Productions additionally purchased all rights to the Diamonds name from the members of the Original Diamonds. When the Original Diamonds attempted to perform in 1986, Diamond Productions initiated legal action, resulting in an injunction against the very people who first popularized the music that brought fame to the Diamonds. The parties to this action agree on at least one thing—the Original Diamonds have no claim to the name.

Stetson filed this suit in January 1984 for damages for the alleged infringing use by the Duncan Group and for a permanent injunction prohibiting defendants from using the name. Defendants denied Stetson's ownership and counterclaimed for an injunction and damages on the theory that they were Goodman's successors in interest to the trade name. After a non-jury trial, Judge Martin determined that Goodman never abandoned ownership of the trade name under section 45 of the Lanham Act, 15 U.S.C. § 1127, and therefore that the Duncan Group, as Goodman's successor in interest, held rightful title to the mark. This appeal followed, presenting us with the task of identifying the true Diamonds.

## DISCUSSION

■ To determine that a trademark or trade name is abandoned, two elements must be satisfied: non-use of the name by the legal owner and no intent by that person or entity to resume use in the reasonably foreseeable future. *Silverman v. CBS Inc.*, 870 F.2d 40, 45 (2d Cir.1989) (citing *Saratoga Vichy Spring Co. v. Lehman*, 625 F.2d 1037, 1043 (2d Cir.1980)). *See* 15 U.S.C. § 1127. "Two years of nonuse creates a rebuttable presumption of abandonment." *Silverman*, 870 F.2d at 45 (citation omitted); 15 U.S.C. § 1127. In this case, the district court ruled that Goodman "never intended to abandon his right" to the Diamonds trade name. The district judge found that Goodman's lawsuit against the singing members of the group,

initiated in 1968 and ending in 1973, was "clearly inconsistent with any intent to abandon the name 'The Diamonds'," and that it constituted "further evidence that Goodman never intended to abandon his right to use the name 'The Diamonds'." The "intent to abandon" language directly contradicts *Silverman's* specific rejection of a test based on such an analysis. *Silverman*, 870 F.2d at 46.

■ Stetson challenges the district court's ruling on this issue, claiming that the judge erred by employing the improper standard for determining abandonment. By phrasing the holding in terms of "intent to abandon," Stetson argues, the trial court ignored the controlling precedent of *Silverman*. Under the proper criteria, Stetson contends, Goodman failed to use the trade name between 1968 and 1973, the time of the lawsuit, and Goodman lacked the requisite intent to resume use in the foreseeable future. Defendants-appellees, therefore, could not have obtained good title from their predecessor in interest and are not now entitled to ownership of the trade name. The Duncan Group, on the other hand, argues that even under *Silverman* the evidence supports a finding that Goodman never abandoned the mark and hence, as Goodman's successor in interest, it possesses exclusive rights to the trade name the Diamonds.

■ We agree with Stetson that the district court should have utilized the *Silverman* criteria. However, while the district court applied the wrong standard, we need not remand for further fact-finding and analysis in light of the correct legal standard. An appellate court has the power to decide cases on appeal if the facts in the record adequately support the proper result. *See Bigelow v. Agway, Inc.*, 506 F.2d 551, 555 (2d Cir.1974); 9 Wright & Miller, Federal Practice and Procedure § 2577 (1971 & Supp.1990). Where the facts in the record are inadequate, remand is appropriate. The facts here clearly and sufficiently establish that Goodman never ceased using the trademark, and the issue of intent to resume use need not be con-

fronted. It is therefore unnecessary for us to remand.

■ The *Silverman* precedent formulates the standard for non-use in this Circuit. *Silverman* involved a dispute over use of the characters from the radio and television show "Amos 'n' Andy". *Silverman,* 870 F.2d at 43. The plaintiff in the case, Silverman, was a playwright wishing to use the shows as a basis for one of his works. CBS held the trademark and copyrights from the original airing of the shows but discontinued broadcasting them in response to criticism from civil rights groups about the demeaning and offensive portrayals of blacks. Silverman contended that CBS had abandoned the trademark by withdrawing the shows and failing to make commercial use of anything related to "Amos 'n' Andy" after that time. With no trademark protection, Silverman argued, he was entitled to use the names, characters, and dialogue from the shows in his play. *Id.* at 43.

CBS advanced two theories in its defense. First, because the show was cancelled for "worthy motives," CBS argued that it should not be charged with non-use. Second, CBS claimed that it in fact had used the trademark over the twenty-one year period of alleged non-use by licensing the program for non-commercial use, "challenging infringing uses brought to its attention, ... and periodically reconsidering whether to resume use of the programs." *Id.* at 47.

■ In finding that CBS abandoned its trademark by its actions, we rejected both arguments. We held that in determining non-use, the motive for cessation of use is irrelevant. *Id.* at 47. Furthermore, we stated that neither "challenging infringing uses" nor "sporadic licensing" for non-commercial activities constitutes use. *Id.* at 47–48. To satisfy the use requirement, application of the trademark must be sufficient to maintain "the public's identification of the mark with the proprietor." *Id.* at 48. Minor activities and worthy motives for non-use do not alter the analysis which requires use of the mark to avoid abandonment.

■ Based on the *Silverman* analysis, a court must look to the trademark holder's occupation or business to determine what constitutes use of the mark. For example, in this case, if the Diamonds singing group held the trademark to its name and ceased touring, making and releasing records, and receiving royalties, it would be deemed to have ceased use of its trade name because the public would no longer identify the group name with its members. In cases of the kind before us, where a group's manager holds the trademark, non-use becomes a more difficult inquiry because the mark receives its public recognition through the visibility of the performers. Yet the manager's actions certainly contribute to the group's publicity. By arranging tours, organizing record production, negotiating contracts, finding television and radio spots, and performing other managerial activities, the manager works to increase the popularity of the group by expanding its public exposure. But what activities must the manager engage in to constitute use when the performers turn their backs on their agreement with him?

■ The facts on the record in this case show that Goodman pursued litigation against the group then under contract with him to perform as the Diamonds. Under *Silverman,* a lawsuit against an infringing user ordinarily is not a sufficient excuse for failure to use a trade name. This is because continued use of the name is necessary to avoid the claim of abandonment. *Silverman,* 870 F.2d at 46. A lawsuit, without more, is not sufficient of itself to overcome a claim of abandonment. A trademark must be used or lost to another economic actor more willing to promote the mark in commerce. 15 U.S.C. § 1127 (defining abandonment of trade name). We recognize the importance of this policy concern and reemphasize its validity and significance.

Goodman's suit, however, entailed more than simple enforcement against infringing users to halt use of the trade name. He sued for royalties owed him by the singers and for an injunction to force them to com-

ply with the management contract. He also sought a declaration of sole ownership of the mark. During the same time, the performers Goodman was suing continued to sing and perform as the Diamonds. Goodman's suit was not merely against any infringing user, but rather was against the people who were contractually entitled and obligated to perform under his auspices using the Diamonds name. Goodman did not stop nor seek to stop the *use* of the trade name through his suit. Rather, he desired the monies due him under the management and licensing agreement and sought an injunction to force the singers to conform with the agreement to insure that the trademark remained in the public eye in a fashion its *owner* intended. The Diamonds continued to glitter in the public eye, and Goodman intended that they do so. Therefore, it would be incorrect to conclude that because Goodman sought to enforce his contractual as well as trademark rights, he ceased use of the trade name. Goodman wished to continue the economic activity associated with the Diamonds, but on his own terms as holder of the trademark and manager of the group.

This is a different case from *Silverman*, given Goodman's unique position as manager and licensor. By the nature of their status, managers such as Goodman are constrained in the means available to them for using trademarks. The constraints are not present for performers or, as in *Silverman*, broadcasters, who can use the trademark at any time simply by performing or airing a show. Goodman could only use the name derivatively through the musicians who performed under his management. Here, while the Diamonds continued to perform, their manager, the owner of the mark, sought to enforce his contract with them. Goodman could only sue. He could not be expected to make alternative uses of a trademark in the face of a binding contract for its use by those he was already suing. It would be patently unreasonable to require Goodman to use the trade name in any other way under the circumstances.

As we find that Goodman continuously used the trademark throughout the period in question, Stetson cannot rely on the rebuttable presumption of abandonment arising under 15 U.S.C. § 1127 (abandonment presumed after two years of non-use). Since there was no abandonment, there is no reason for us to consider whether Goodman exhibited an intent to resume use in the reasonably foreseeable future. *See Silverman*, 870 F.2d at 45. Goodman never having abandoned the Diamonds trade name, the Duncan Group clearly obtained good title to it from its predecessors in interest, including Goodman.

## CONCLUSION

For the foregoing reasons, we affirm the district court judgment declaring that defendants-appellees have the sole right to use the Diamonds name and permanently enjoining plaintiff-appellant from using the trade name or trademark.