David McKAY, et al.

v.

MAD MURPHY'S, INC., et al.

No. 3:93–cv–2090 (JBA).

United States District Court,
D. Connecticut.

Aug. 31, 1995.

Robert S. Smith, Hartford, CT, for plaintiff.

Joseph Anthony Fischetti, Pepe & Hazard, Hartford, CT, for defendants.

## RULING ON DEFENDANT CAFAREL-LA'S MOTIONS TO DISMISS AND PARTIES' CROSS–MOTIONS FOR SUMMARY JUDGMENT

ARTERTON, District Judge.

### I. Introduction

In this trademark action, the parties each claim the right to use the trademark "Mad Murphy" or "Mad Murphy's," in connection with their Hartford business ventures. Plaintiffs David McKay and Robert McKay have a partnership which operates the Municipal Cafe, a Hartford restaurant and bar that offers entertainment services under the promotional name of "Mad Murphy Presents." Defendant Mad Murphy's Inc. is a corporation that operates "Mad Murphy's", a restaurant and bar offering live music entertainment services at 22 Union Street in New Haven. Also named as defendants are the corporate directors and officers of Mad Murphy's Inc. (Defendant Perry T. Claing, President; Defendant Richard I. Goldberg, Secretary and Director; and Defendant Jennifer A. Reiley, Director). Defendant Margaret Cafarella is the permittee on the permit issued by the state of Connecticut Liquor Control Department for the premises operated by Defendant Mad Murphy's, Inc.

Plaintiffs allege that the Defendants Mad Murphy's, Inc., *et al.*, have infringed on their use of the Mad Murphy trademark in viola-tion of the Lanham Act, 15 U.S.C. §§ 1121, 1125(a), the Trademark Laws of the United States, 15 U.S.C. § 1051 *et seq.*, 28 U.S.C. § 1338(b), the Connecticut Unfair Trade Practices Act (CUPTA), Conn.Gen.Stat. §§ 42–110a *et seq.* (1993), and the Connecticut trademark laws, Conn.Gen.Stat. §§ 35–11a *et seq.* (1993). Plaintiffs also include a claim in their complaint for tortious incorporation. In addition, plaintiffs seek an injunction, an accounting of defendants' profits, actual and treble damages, costs and attorney's fees.

Defendants plead affirmative defenses of lack of trademark ownership, fraud, and/or bad faith in registration of trademark, "unclean hands," and estoppel due to a bankruptcy decree. Defendants also counterclaim against plaintiffs, alleging their violation of the Lanham Act, state and federal trademark laws, and CUTPA by their use of the "Mad Murphy" name. Defendants further seek an injunction to bar plaintiffs from using the Mad Murphy's mark and an order cancelling plaintiffs' registration of the Mad Murphy's trademark with the Secretary of the State.

Pending before the court are Defendant Cafarella's Motion to Dismiss and Plaintiffs' and Defendants' Motions for Summary Judgment on the complaint and counterclaim, respectively.

### II. Facts

The following facts in this case are not in dispute. In 1973, Plaintiff David McKay and a partner owned the corporation Walsh's Grill, Inc., which consisted of a bar named Mad Murphy's located at 22 Union Street in Hartford. The "Mad Murphy's" trademark was then registered by the corporation with the Secretary of the State of Connecticut on or about November 6, 1973. David McKay was a principal in the corporation for two to three years and then sold his shares to the remaining partner for $30,000. Following the sale, the name of the corporation was formally changed to Mad Murphy's, Inc. and was operated without any further control by plaintiff David McKay.

In April 1977, Mad Murphy's, Inc. filed a Chapter XI bankruptcy proceeding and the corporation was adjudicated bankrupt on

January 18, 1979. The trustee in bankruptcy sold the assets of Mad Murphy's, Inc., specifically including the "Mad Murphy's" trade name, to David Hurovitz for $10,000. This sale was approved by the Bankruptcy Court on February 2, 1979, and Mr. Hurovitz continued to operate the bar as "Mad Murphy's."

In 1983, an individual named Gorman Berchard purchased the business from Mr. Hurovitz and continued to operate the bar under the Mad Murphy's name until July 1985. At that time, Mr. Berchard changed the name of the bar (still at 22 Union Street) to "Bopper's." After July 1985, however, Mr. Berchard did not use the "Mad Murphy's" trademark except to promote two St. Patrick's Day celebrations at Bopper's between 1986 to 1988. In the meanwhile, the state registration of the Mad Murphy's trademark expired on November 6, 1983 and was never renewed by Mr. Berchard.

The bar at 22 Union Street operated under the name "Boppers" from July 1985 to May 1993. In May 1993, Defendant Mad Murphy's, Inc. purchased Bopper's for $50,000 from Mr. Berchard. The sale included title to the name of "Mad Murphy's," the fixtures of the business, and the original Mad Murphy's signs from the mid–1970's. Defendants allege that they also bought the "good will" of the Mad Murphy's name from Mr. Berchard, although this is not expressly stated in the assignment. Before the Bopper's sale was finalized, Defendant Perry Claing reserved the corporate name Mad Murphy's with the office of the Secretary of State for the business he planned to open. Mr. Claing states that a state worker at the Secretary of State's office ran the name through the computer an informed him that the name had expired. A Receipt of Reservation was issued on March 19, 1993, and Mr. Claing filed incorporation papers on May 7, 1993. In late March 1993, an article appeared in the *Hartford Courant* announcing the reopening of Mad Murphy's bar (defendants' operation) at 22 Union Street. On October 14, 1993, after a summer of renovations, defendants reopened the 22 Union Street property as

"Mad Murphy's" cafe which included a bar featuring live entertainment, primarily consisting of rock and roll bands.

Meanwhile, during the last two years of "Bopper's" operations at 22 Union Street, plaintiffs resumed using the name "Mad Murphy" (without the " 's") to promote bands appearing at their Hartford bar, the Municipal Cafe.[1] Such use began on March 29, 1991. Beginning on April 9, 1992, plaintiffs printed flyers and placed advertisements in the *Hartford Advocate*, announcing the scheduled appearances of musical groups under the heading "Mad Murphy Presents." Plaintiffs have continued to use the "Mad Murphy" name in this manner to the present.

On April 1, 1993, after discussing the *Hartford Courant* article regarding the reopening of the defendants' Mad Murphy's bar with Plaintiff Robert McKay, an individual named Paul Kehoe, who was unrelated to the plaintiffs' Municipal Cafe, filed a state trademark registration for the name "Mad Murphy" with the Secretary of State, which issued permit # 8922 to Mr. Kehoe on April 6, 1993. On this application, Mr. Kehoe omitted any information related to the prior use of the name "Mad Murphy" by Plaintiff David McKay. Subsequently, Mr. Kehoe assigned the rights in the trademark to Plaintiffs David McKay and Robert McKay for $1. (Defendants' Exhibit FF). The plaintiffs commenced this action for trademark infringement against defendants on October 19, 1993, five days after defendants' reopened Mad Murphy's bar.

### III. Discussion

#### A. Standard for Summary Judgment

A grant of a summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the non-mov-

---

1. The record contains no evidence that the name "Mad Murphy" was used by any party to pro-

mote *musical groups* at any other location than the Municipal Cafe.

ing party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A disputed fact is material if it "might affect the outcome of the suit under the governing law." *Id.*

The moving party must initially demonstrate that there are no material facts in dispute and "[a]ll reasonable inferences and any ambiguities are drawn in favor of the non-moving party." *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2nd Cir.1990). The non-moving party may defeat the motion for summary judgment by producing sufficient specific facts to establish that there is a genuine issue of material fact for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 332, 106 S.Ct. 2548, 2557, 91 L.Ed.2d 265 (1986).

### B. Defendant Cafarella's Motion to Dismiss/Motion for Summary Judgment

■ Defendant Cafarella filed a Motion to Dismiss under Fed.R.Civ.P. Rule 12(b)(6) or in the alternative, a Motion for Summary Judgment pursuant to Fed.R.Civ.P. Rule 56. Defendant Cafarella maintains that plaintiffs' complaint does not associate her with the defendant corporation except as the permittee on a cafe permit issued to 22 Union Street. As the permittee, she maintains that she did not know of any trademark problem associated with the Mad Murphy's name.

Under Rule 12(b)(6), if matters outside the pleading are presented and not excluded by the court, a court has the authority to consider matters outside the pleadings and to change the motion to one for summary judgment under F.R.Civ.P. Rule 56. This Court chooses to exercise such authority here.

Margaret Cafarella was the permittee on the permit issued by the State of Connecticut Liquor Control Department for the premises operated by Defendant Mad Murphy's Inc. In order for her to be a contributory infringer of plaintiffs' use of the trademark, plaintiffs must show that Ms. Cafarella knew or reasonably expected that other defendants were engaging in the alleged wrongdoing. *Coca–Cola Co. v. Snow Crest Beverages, Inc.,* 64 F.Supp. 980, 989 (D.Mass.1946) *affirmed,* 162 F.2d 280 (1st Cir.1947), *cert. denied,* 332 U.S. 809, 68 S.Ct. 110, 92 L.Ed. 386 (1947);

*Display Producers, Inc. v. Shulton, Inc.,* 525 F.Supp. 631 (S.D.N.Y.1981).

In her affidavit in support of the motion to dismiss, Defendant Cafarella states that she was asked by Defendant Claing in July 1993 to be the permittee for the premises of the reopened Mad Murphy's at 22 Union Street. On July 29, 1993, Defendant Cafarella filed an application for a liquor permit with the Department of Liquor Control listing herself as permittee. Sometime in August 1993, Defendant Claing told her that once the permit was approved he would substitute his name on the permit, which was done on November 18, 1993. All of Ms. Cafarella's above statements are confirmed by Defendant Claing's affidavit.

Ms. Cafarella states that she made this application without the expectation of receiving compensation because she thought a reopened Mad Murphy's would be beneficial to the downtown Hartford economy. Ms. Cafarella states that she had no knowledge of the any trademark problem when she filed the permit application. She also states that she has never held an officer position in Mad Murphy's, Inc., has never owned shares in the corporation, was not involved in the decision to reopen Mad Murphy's, and was never involved in any advertising or marketing of Mad Murphy's. She maintains that she understood that her responsibilities as permittee to be limited to the provisions of Conn. Gen.Stat. § 30–22a (1993), which allows the retail sale of alcoholic liquor to be consumed, requires food to be available for sale on the premises, and requires compliance with local health department regulations.

■ Because Defendant Cafarella in her motion to dismiss asked the court to consider the motion under Rule 56, plaintiffs were provided reasonable opportunity to present contradictory documentation to establish the existence of a genuine issue of material fact. Plaintiffs offer no proof in their responsive pleadings to defendant's Motion that establishes as a genuine issue of material fact that Ms. Cafarella had any knowledge of the trademark dispute prior to applying for the

permit.[2] Plaintiffs cite a State Liquor Control Commission regulation that makes a permittee strictly liable for violations of codes and regulations of the liquor control commission for violations. Conn. Agencies Regs. § 30–3–A09 (1993).[3] This regulation, however, only applies to "disciplinary proceedings" before the state liquor control commission and concerns only the permit application or the permit premises. *Id.* Thus, the regulation does not extend to judicial proceedings or to violations of statutes other than the state liquor control laws, and has no relevance here. *See Kendrick v. Daniel's, Inc.,* 1992 WL 83795 (Conn.Super. April 20, 1992). (Permittee's Motion for Summary Judgment granted after finding that permittee did not supervise employees and did not own or control discotheque where plaintiff was allegedly assaulted by discotheque employees).

Since plaintiffs offer no evidence demonstrating the existence of a genuine disputed issue of material fact as to Ms. Cafarella's lack of knowledge of the defendants' alleged trademark infringement prior to the permit application filing or that she had control of the defendants' business, Defendant Cafarella's Motion for Summary Judgment will be granted.

## C. Parties' Cross–Motions for Summary Judgment

Each party maintains that it has the superior right to use the trademark "Mad Murphy" or "Mad Murphy's," and that the other party, through its use, is unlawfully infringing on the other's legally-protected mark. In order to address the individual claims of trademark infringement, the Court must first determine the validity of each party's equitable or legal claim to a trademark interest in the Mad Murphy's name.

Defendants claim their exclusive right to use the name "Mad Murphy's" emanates from the bankruptcy proceeding, through Mr. Berchard, and his assignment to defendants. Plaintiffs maintain that Mr. Berchard lost all of his legal right in the mark by abandoning it through nonuse, and thus any purported assignment of the trademark to Defendants was ineffectual.

Plaintiffs claim their right to exclusive use of the trademark in two ways. First, plaintiffs allege a continued right to the mark from David McKay's use of the trademark during the 1970's. In the alternative, plaintiffs claim that after the trademark was abandoned by Gorman Berchard, the plaintiff partnership acquired rights in the trademark by legally using it to promote bands at the Municipal Cafe and by subsequently registering it with the State of Connecticut. Defendants charge that plaintiffs did not acquire exclusive rights in the mark because plaintiffs' use of the trademark was not bona fide, and because plaintiffs registered it in bad faith after learning of defendants' forthcoming reopening of Mad Murphy's bar.

### 1. Plaintiff David McKay retained no right to the trademark by his sale to his partner

"A trademark or trade name symbolizes the goodwill attached to a business." *Defiance Button Machine Co. v. C & C Metal Products Corp.,* 759 F.2d 1053, 1059 (2nd Cir.1984), *cert. denied,* 474 U.S. 844, 106 S.Ct. 131, 88 L.Ed.2d 108 (1985). Since a trademark "represents the reputation developed by its owner for the nature and quality of goods or services sold by him, he is entitled to prevent others from using the mark to describe their own goods." *Id.* (citations omitted).

As discussed previously, Plaintiff David McKay was one of the founders and owners of the original Mad Murphy's bar in the 1970's. In 1975 or 1976, Plaintiff McKay sold his entire one half interest in the corporation Walsh's Grill d/b/a Mad Murphy's to his partner. Mr. McKay admitted in deposition that he had no further control of that business

---

**2.** Discovery has been completed since plaintiff's response was filed on February 4, 1994. Plaintiff has not supplemented its pleadings with any evidence regarding the state of Defendant Cafarella's knowledge of the trademark infringement when she made the permit application or control of Mad Murphy's, Inc.

**3.** The regulation states: "A permittee and backer shall be held strictly liable for any violation of the statutes, regulations, policies and stipulations of the liquor control commission when such violation concerns their permit premises or their applications regarding their proposed permit premises." Conn.Agencies Regs. § 30–6–A9 (1993).

thereafter. (D. McKay Deposition, Defendants' Exh. A) Once Mr. McKay transferred his interest to his partner, Mr. McKay was divested of all rights to use of the trade name. 2 McCarthy, *McCarthy on Trademarks* § 18.04[1] (3rd ed. 1995) ("After an assignment, the assignor has divested himself of his trademark rights, and the title of the assignor is superior."); *Premier Dental Products Co. v. Darby Supply Co.*, 794 F.2d 850, 854 (3rd Cir.1986), *cert. denied*, 479 U.S. 950, 107 S.Ct. 436, 93 L.Ed.2d 385 (1986) ("[F]ollowing a proper assignment, the assignee steps into the shoes of the assignor.")

■ If Plaintiff David McKay retained any interest in the good will of the business after the sale, it was extinguished and superseded by the bankruptcy trustee's sale. A trustee in bankruptcy has the power to sell the trademarks and accompanying good will of the bankrupt and "the buyer has superior rights to the bankrupt in the mark." 2 *Id.* § 18.09[1] (*citing Mutual Life Ins. Co. v. Menin*, 115 F.2d 975 (2nd Cir.1940)); *See also Merry Hull & Co. v. Hi–Line Co., Inc*, 243 F.Supp. 45, 50 (S.D.N.Y.1965) ("Goodwill is an asset of a bankrupt like any other asset ...."). The undisputed evidence submitted shows that the bankruptcy trustee was vested with the title to the trademark and sold it to Mr. Hurovitz. For these reasons, plaintiffs have no legal basis for their current trademark claim as deriving from David McKay's involvement in the original Mad Murphy's.

## 2. The Mad Murphy's trademark was abandoned by Gorman Berchard

■ Defendants claim their right to the trademark is derived from their purchase

from Gorman Berchard. Plaintiffs allege, however, that the chain of title in the trademark was broken by Mr. Berchard's abandonment of the trademark during the late 1980's. Plaintiffs reason that if the trademark was abandoned, Mr. Berchard had no right to assign the "Mad Murphy's" trademark to Defendants because he no longer had rights to it.

■ The criteria to determine whether a trademark has been abandoned are outlined in *Silverman v. CBS*, 870 F.2d 40, 45 (2nd Cir.1989), *cert. denied*, 492 U.S. 907, 109 S.Ct. 3219, 106 L.Ed.2d 569 (1989). *See Stetson v. Howard D. Wolf & Associates*, 955 F.2d 847, 851 (2nd Cir.1992) ("The Silverman precedent formulates the standard for nonuse in this Circuit."). In order for a trademark or a trade name to be deemed abandoned, two elements must be shown "(1) nonuse of the name and (2) no intent by that person or entity to resume use in the reasonably foreseeable future." [4] *Stetson*, 955 F.2d at 850 (*citing Silverman*, 870 F.2d at 45). Intent not to resume the use of a mark "may be inferred from circumstances." 15 U.S.C. § 1127 (1993).

■ The burden of proof of abandonment rests with the party making the claim, and this evidence must be clear and convincing.[5] *See Saratoga Vichy Spring Co., Inc. v. Lehman*, 625 F.2d 1037, 1044 (2nd Cir.1980). Under the Lanham Act, "[t]wo years of nonuse creates a rebuttable presumption of abandonment." *Silverman*, 870 F.2d at 45 (*citing Saratoga Vichy Spring Co.*, 625 F.2d at 1044); 15 U.S.C. § 1127 (1993) ("Nonuse

---

4. Defendants argue that the Court should instead follow the criteria outlined in *Defiance* which expressly considers the intent of either the owner or the assignee to use the trademark within a reasonable period of time. *Defiance*, 759 F.2d at 1060. Subsequent Second Circuit cases have failed to expressly state whether the intent of assignees should be considered. *See, E.g. Silverman*, 870 F.2d at 45; *Stetson*, 955 F.2d at 851. However, harmony can be found between *Defiance* and these subsequent cases by examining the intent of the parties (owners and/or assignees) within a reasonable period of time. Here, because there was no intent to resume use by either the owner or the assignees *within a rea-*

*sonable period of time,* this distinction is without significance.

5. Plaintiffs are incorrect that a "preponderance of the evidence" standard applies in this case. *See Cerveceria Centroamericana, S.A. v. Cerveceria India, Inc.*, 892 F.2d 1021 (Fed.Cir.1989). This standard is the minority view of the Circuits and is not followed in the Second Circuit. 2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition*, § 17.03[3] (3rd ed. 1995); *Saratoga Vichy Spring Co., Inc. v. Lehman*, 625 F.2d 1037, 1044 (2nd Cir.1980) ("abandonment, being a forfeiture of a property interest, should be strictly proved ....").

for two consecutive years shall be prima facie evidence of abandonment).

There is no dispute that Gorman Berchard stopped using the trademark for a period of at least two years after he changed the name of the club to "Boppers" in June 1985. Mr. Berchard's only use of the "Mad Murphy's" name was to promote two St. Patrick's Day celebrations at Bopper's between 1986 and 1988. Even assuming that using the name once a year constituted use of the "Mad Murphy's" name, there is no dispute that the "Mad Murphy's" trademark was not used subsequently in any way by Mr. Berchard for more than a two year period between 1988 and 1993.

Plaintiffs also submit Mr. Berchard's deposition in which he testifies that he did not have any intent to use the name after July 1985. (G. Berchard Dep., p. 72, Plaintiffs' Exh. 1). Mr. Berchard states he was aware that Mad Murphy's name was being used by plaintiffs at the time of his sale of the Bopper's business to the defendants, but did nothing to stop its use. (G. Berchard Dep., p. 28, Plaintiffs' Exh. 1). Further, plaintiffs note that Mr. Berchard allowed the Mad Murphy's trademark to expire in November 1983 and never renewed it, further evidencing Mr. Berchard's intent to abandon the trademark. *See* 3 Altman, *Callmann Unfair Competition Trademarks and Monopolies* § 19.65 (4th ed. 1995) (*citing DC Comics, Inc. v. Powers*, 465 F.Supp. 843 (S.D.N.Y. 1978)) ("owner's failure to renew a registration is not itself an abandonment ... although it may, under certain circumstances be *evidence* of an intention to abandon.").

Because defendants' predecessor did not use the trademark for more than two years, the plaintiffs have met their burden of presumption of abandonment. *See E. Remy Martin & Co., S.A. v. Shaw–Ross Int'l Imports, Inc.*, 756 F.2d 1525, 1532 (11th Cir. 1985) (plaintiff made out at least a *prima facie* case of abandonment where mark was not used for six years). Thus, the burden

shifts to the defendants to show that Mr. Berchard intended to resume the use of the "Mad Murphy's" name. *Id.* ("The burden of proof shifted to Myers to demonstrate that circumstances did not justify the inference of intent not to resume use.") To refute an allegation of abandonment, the contesting party must "proffer more than conclusory testimony or affidavits." *Imperial Tobacco Ltd., Assignee of Imperial Group PLC v. Philip Morris, Inc.*, 899 F.2d 1575, 1581 (Fed.Cir.1990). In this case, defendants must put forth evidence as to what activities Gorman Berchard engaged in during the period of nonuse or "what outside events occurred from which an intent to resume use during the nonuse period may be reasonably inferred." *Id.*

Defendants offer two pieces of evidence to rebut the claim of abandonment. First, defendants proffer the affidavit of Alan Smith, Vice President of Konover Management Corporation, the managing agent of 22 Union Street when Gary Berchard owned Bopper's (Defendant's Exhibit T). Mr. Smith's affidavit summarizes his conversations with Mr. Berchard in January 1993, relative to Mr. Berchard's intention to sell the Mad Murphy's trademark to defendants. Mr. Smith's recount of Mr. Berchard's statements in the affidavit is inadmissible hearsay under Fed. R.Evid. 801, and thus, they cannot be considered by the Court under Fed.R.Civ.P. 56(e) ("Supporting and opposing affidavits ... shall set forth facts as would be admissible in evidence.")

The only evidence submitted by defendants that is properly considered are documents purporting to show the structure of Mr. Berchard's business interests. Defendants point to the fact Mr. Berchard used the Dalchard company as a holding company to hold the rights to the trademark as evidence that the defendants' predecessors intended to eventually transfer rights to the Mad Murphy's name.[6]

---

6. One of the powers granted to Dalchard in its incorporation papers is the power:

[t]o acquire by purchase or otherwise hold, sell, convey and have and exercise any and all rights of ownership or interest in and to any real or personal property whatsoever, including, without limitation, shares, securities, and other interest in or obligation of the corporations or associations, individuals or governmental units.
(Dalchard Certificate of Incorporation, Defendant's Exhibit QQ).

The Second Circuit has found that evidence of an intent to sell a trademark after nonuse is "inconsistent with an intent to abandon the mark." *Saratoga Vichy Spring Co.*, 625 F.2d at 1044; *Defiance Button Machine Co.*, *supra*. In *Defiance*, the Second Circuit rejected an abandonment claim where the owner ceased its operations, resulting in a brief period of nonuse, during which it sought to sell the trademark, and upon finding no buyer, became a subsidiary of another company in the same line of trade and prepared to resume business. In *Saratoga Vichy Spring Co.*, *supra*, the Second Circuit rejected a claim of abandonment based on seven years of nonuse based on a finding that the trademark owner continuously sought to sell the mark along with its associated mineral water business. The Second Circuit noted that "[i]n both cases, the proprietor of the mark had an intention to exploit the mark in the *reasonably foreseeable future* by resuming its use or by permitting its use by others." *Silverman*, 870 F.2d at 47 (emphasis added).

In contrast in this case, it is undisputed that Mr. Berchard did not use the trademark in any way after 1988. Mr. Berchard has admitted his intent to abandon and he made no efforts to sell the mark until 1993, five years after his last use. The Court concludes, therefore, as a matter of law that the defendants' proffered evidence of an intent to sell in 1993 does not permit an inference of intent to resume use within a reasonable period of time after use of the mark was discontinued. *AmBrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531, 1551 (11th Cir.1986), *cert. denied* 481 U.S. 1041, 107 S.Ct. 1983, 95 L.Ed.2d 822 (1987) ("That Kraft in fact used the mark in 1980 does not mean that Kraft intended to use mark in 1978.").

The fact that Mr. Berchard put the mark into a separate holding company is also not enough, in itself, to make his intent a genuine issue of material fact. *See Silverman*, 870 F.2d at 47 ("A bare assertion of possible future use is not enough."). Under the Lanham Act, " '[u]se' of a mark means the bona fide use of that mark made in the ordinary course of trade, and not made merely to reserve a right in the mark." 15 U.S.C. § 1127 (1993).

In *Exxon Corp. v. Humble Exploration Co., Inc.*, 695 F.2d 96 (5th Cir.1983), Exxon substantially reduced its use of the "Humble" trademark, from extensively using it as a product brand name to putting it only on "isolated products or selected invoices sent to selected customers." *Id.* at 100. In overturning the trial court's finding that such limited use protects the trademark from a claim of abandonment under the Lanham Act, Judge Higginbotham of the Fifth Circuit wrote:

> [T]he Lanham Act rests on the idea of registration of marks otherwise born of use rather than the creation of marks by the act of registration. That precept finds expression in the Lanham Act requirement that to maintain a mark in the absence of use there must be an intent to resume use. That expression is plain. The Act does not allow the preservation of a mark solely to prevent its use by others. Yet the trial court's reasoning allows precisely that warehousing so long as there is a residual good will associated with the mark. Exxon makes the same argument here. While that may be good policy, we cannot square it with the language of the statute. In sum, these arranged sales in which the mark was not allowed to play its basic role of identifying source were not "use" in the sense of section 1127 of the Lanham Act.

*Id.* at 101.

A trademark must be "used" in order to maintain "the public's identification of the mark with the proprietor." *Silverman*, 870 F.2d at 47. The Second Circuit has stated, "Minor activities and worthy motives for non-use do not alter the analysis which requires use of the mark to avoid abandonment." *Stetson*, 955 F.2d at 851. The Court finds that placing the mark in a holding company without making any efforts to use or sell does not constitute "bona fide" use under the Lanham Act, and that this evidence is not probative of an intent to resume use. *See La Societe Anonyme des Parfums Le Galion v. Jean Patou, Inc.*, 495 F.2d 1265, 1271 (2nd Cir.1974) ("bona fide" use means deliberate and continuous use); *Major*

*League Baseball v. Sed Non Olet Denarius,* 817 F.Supp. 1103, 1129 (S.D.N.Y.1993) ("Rights in a trademark are lost when trademarks are 'warehoused.'"); *Intrawest Financial Corp. v. Western National Bank,* 610 F.Supp. 950, 959 (D.Colo.1985) ("Mere warehousing of marks is impermissible under the Lanham Act."). Although the placing of the trademark in the holding company *may* be evidence of Mr. Berchard's intent not to abandon, it is not indicative of an intent to resume use. *Silverman,* 870 F.2d at 46 (distinguishing between "intent to resume use" and "intent to abandon"); *Exxon,* 695 F.2d at 103 n. 7 (In cases in which warehousing of marks is an issue, "'intent not to resume use' ... differs in a pivotal way from 'intent to abandon.'")

The defendants have failed to adduce any evidence of Berchard's intent to resume use or sell the trademark between 1988 and 1993 necessary to meet their burden, and the Court finds as a matter of law that Gorman Berchard abandoned the Mad Murphy's trademark.

**C.  The trier of fact will determine the parties' current rights to the abandoned trademark**

■ Since the Mad Murphy's trademark was abandoned by Gorman Berchard, the Court must now consider whether a determination can be made on this summary judgment record as to which party has a proper claim to the mark and for what purposes. As the Second Circuit has stated, "[A]n abandoned trademark is fair game for any merchant or manufacturer who seeks to use it." *P. Daussa Corp. v. Sutton Cosmetics (P.R.) Inc.,* 462 F.2d 134, 136 (2nd Cir. 1972). When two or more companies adopt the same mark, basic rules of trademark priority determine use and ownership in the mark. *See* 2 McCarthy, *supra,* § 17.01[2]. The right to use a trademark "grows out of its use, not its mere adoption." *United Drug Co. v. Theodore Rectanus Co.,* 248 U.S. 90, 97, 39 S.Ct. 48, 50, 63 L.Ed. 141 (1918). The Second Circuit has outlined its criteria to determine priority in a mark:

The user who first appropriates the mark obtains on [sic] enforceable right to exclude others from using it, as long as the initial appropriation and use are accompanied by an intention to continue exploiting the mark commercially ... Adoption and a single use of the mark may be sufficient to entitle the user to register the mark ... To prove bona fide usage, the proponent must demonstrate that his use of the mark has been deliberate and continuous, not sporadic, casual or transitory.

*La Societe Anonyme des Parfums Le Galion v. Jean Patou, Inc.,* 495 F.2d at 1270 (2nd Cir.1974) (citations omitted).

■ It is without dispute that plaintiffs used the "Mad Murphy" name between 1991 and 1993 to promote bands appearing at the Municipal Cafe before filing their trademark application. To demonstrate their use, plaintiffs reference their use of the "Mad Murphy" name on numerous of their *Hartford Advocate* advertisements and on flyers which are circulated to their mailing list.

Defendants claim that plaintiffs' use of the "Mad Murphy" name was minimal and insufficient to constitute bona fide use to confer rights in the name to plaintiffs. *See Merry Hull,* 243 F.Supp. at 52 (token sales to relatives and friends not a "bona fide commercial operation" entitling plaintiff to a claim of ownership in the mark). Defendants point to several factors they claim are illustrative of the insufficiency of plaintiffs' use of the trademark. The plaintiffs list their booking agent in the *Talent Buyers Directory* as "Dollar Bill Booking," not "Mad Murphy;" contracts for bands signed by plaintiffs to appear at the Municipal Cafe are signed under the name Municipal Cafe, not "Mad Murphy"; plaintiffs did not list the Mad Murphy name in the Hartford Yellow Pages; and plaintiff David McKay admitted in his deposition that the plaintiffs' use of the "Mad Murphy" name was "an in-house feature." However, the actual extent of plaintiffs' use of the trademark and under what circumstances it was used requires a factual determination.

■ Defendants also allege that plaintiffs' use and registration of the mark was in

bad faith.[7] Defendants allege that the fact that the plaintiffs used the mark for two years, yet filed their trademark registration application only two days after learning that the defendants' Mad Murphy's cafe was re-opening, shows plaintiffs' bad faith effort to gain an advantage for this lawsuit. In support of their allegations, defendants cite to these facts in the record:

(1) Robert McKay's deposition statement that he knew that Gary Berchard was having business troubles and wanted "to get the name tied up once and for all" as evidence of plaintiffs' bad faith.

(2) Paul Kehoe, who was not a Municipal Cafe employee, applied for the permit and later assigned the rights in the trademark to Plaintiffs for $1. Mr. Kehoe states that David McKay and Robert McKay did not sign the application because he did not have time to get their notarized signatures; and

(3) Mr. Kehoe failed to reveal David McKay's past ownership of the trademark on the state trademark application because he did not think it was relevant.

Resolving issues of bona fide use and bad faith involves, among other considerations, a determination of the credibility of David McKay, Robert McKay, and Paul Kehoe. Questions of credibility involve subjective determinations of one's state of mind which can only be made by the trier of fact at trial. *See* 10A Wright, Miller & Kane, *Federal Practice & Procedure* § 2732.1 (2nd ed. 1983 & Supp.1994) As Judge Frank said in *Arnstein v. Porter*, a copyright infringement case brought against Cole Porter:

[W]here, as here, credibility ... is crucial summary judgment becomes improper and a trial indispensable. It will not do, in such a case, to say that, since the plaintiff, in the matter presented by his affidavits, has offered nothing which discredits the honesty of the defendant, the latter's deposition must be accepted as true. We think that Rule 56 was not designed thus to foreclose plaintiff's privilege of examining defendant at trial, especially to matters peculiarly within the defendant's knowledge.

*Arnstein v. Porter*, 154 F.2d 464, 471 (2nd Cir.1946). Thus, this Court concludes that whether plaintiffs' use was bona fide or whether the trademark was registered in bad faith is a question of fact which is to be resolved at trial. *See Citizens Bank of Clearwater v. Hunt*, 927 F.2d 707, 711 (2nd Cir.1991) (Allegation of bad faith or fraud involves issues of Plaintiffs' intent and credibility which is inappropriate for summary judgment).

## IV. CONCLUSION

Based on the foregoing, Defendant Cafarella's Motion for Summary Judgment (Docket # 12) is hereby GRANTED. Plaintiff's Motion for Summary Judgment (# 25) and Defendants' Cross–Motion for Summary Judgment (# 29) are hereby DENIED.

SO ORDERED.

---

**7.** There is no Connecticut case law interpreting the term "bad faith" as it applies to the Connecticut trademark statute, Conn.Gen.Stat. § 35–11g. The Connecticut Supreme Court, however, has defined bad faith as:

... actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or contractual obligation, not prompted by an honest mistake as to one's right or duties, but by some interested or sinister motive.

*Habetz v. Condon*, 224 Conn. 231, 237, 618 A.2d 501, 504 (1992) *quoting Black's Law Dictionary* (5th Ed.1979); *Wadia Enterprises, Inc. v. Hirschfeld*, 224 Conn. 240, 248, 618 A.2d 506 (1992).