This Opinion is a
Precedent of the TTAB

Mailed: May 7, 2018

**UNITED STATES PATENT AND TRADEMARK OFFICE**
**Trademark Trial and Appeal Board**

————

*Yazhong Investing Ltd.*

*v.*

*Multi-Media Tech. Ventures, Ltd.*

————

Cancellation No. 92056548

————

Amanda V. Dwight of Dwight Law Group, for Yazhong Investing Ltd.

Multi-Media Tech. Ventures, Ltd., *pro se*.[1]

————

**Before Cataldo, Taylor and Greenbaum, Administrative Trademark Judges.**

**Opinion by Cataldo, Administrative Trademark Judge:**

Respondent, Multi-Media Tech. Ventures, Ltd., is the owner by assignment of four registrations for the mark GIDGET (in typed or standard characters[2]) on the Principal Register for the following goods and services:

---

[1] The request to withdraw filed on May 10, 2016 by Respondent's former counsel was granted in a Board order issued on May 17, 2016. 53 TTABVUE; 54 TTABVUE.

Citations in this opinion will be to the TTABVUE docket entry number and, where applicable, the electronic page number where the document or testimony appears. Because the Board primarily uses TTABVUE in reviewing evidence, the Board prefers that citations to non-confidential parts of the record include the TTABVUE docket entry number and the TTABVUE page number. *See RxD Media, LLC v. IP Application Devel. LLC,* 125 USPQ2d 1801, 1804 (TTAB 2018).

[2] Effective November 2, 2003, Trademark Rule 2.52, 37 C.F.R. § 2.52, was amended to replace the term "typed" drawing with "standard character" drawing. A mark depicted as a typed

Registration No. 2093572 ('572 Reg.)
clothing, namely, blouses, pants, shifts, skirts, jackets, dresses, shorts, hats, belts, sandals, bathing suits, shoes and tops in International Class 25;[3]

Registration No. 3197189 ('189 Reg.)
cosmetics, namely lip balm, lip stick; tanning agents, namely tanning oil, tanning gel, tanning cream; soap, namely, skin soap, bath soap; bath products, namely bath powder, bath oils, bubble bath; perfume and essential oils for personal use; hair products, namely hair shampoo, hair conditioner in International Class 3;

vehicles, namely, bicycles, tricycles, pull wagons, and baby strollers in International Class 12;

jewelry, watches in International Class 14;

stationery, envelopes, greeting cards, coloring books, song books, comic books, address books, short story books, educational books in the field of surfing, skateboarding, swimming, and topics of interest to young women, pop-up books, diaries, book marks, cardboard gift boxes, plastic gift wrap, painting sets, paper napkins, toilet paper, disposable diapers, newsletters and magazines in the field of surf movies, surfing, skateboarding and topics of interest to young women in International Class 16; and

pillow cases, bed sheets, comforters, cloth table covers, bath towels, hand towels, wash cloths, cloth bath mats, and shower curtains in International Class 24;[4]

Registration No. 3740628 ('628 Reg.)
Eyewear, namely, optical frames and optical lenses, sunglass frames, sunglass lenses, cases for eyewear, cases for sunglasses, and structural parts and fittings for eyewear and sunglasses; cellular telephones; cellular telephone apparatuses, namely, cellular telephone face plates, cellular telephone cases, belt clips and holders specially adapted for cellular telephones, cellular telephone keypads, cellular telephone lenses in

---

drawing is the legal equivalent of a standard character mark.

[3] Issued September 2, 1997. Trademark Act Section 8 and 15 affidavits, 15 U.S.C. §§ 1058 and 1065, accepted and acknowledged. First Renewal.

[4] Issued January 9, 2007. Expired Section 9, 15 U.S.C. § 1059, August 11, 2017.

the nature of fitted plastic films known as skins for covering and providing a scratch proof barrier or protection for cellular telephones, and cellular telephone antennas; computer games on CD-ROMs, DVDs, HD DVDs, MP3 discs, videotapes, and optical and magneto-optical discs; pre-recorded CD-ROMs, DVDs, HD DVDs, MP3 discs, videotapes, optical and magneto-optical discs, audio compact disks and cassettes all featuring music and spoken word in the fields of surfing, skateboarding, snowboarding and active lifestyles; audio compact disk players; handheld digital electronic devices for recording, organizing, transmitting, manipulating, and reviewing text, data, audio and video files featuring surfing, skateboarding, snowboarding and active lifestyles; audio cassette players; MP3 players; DVD players; HD DVD players; CD-ROM players; optical and magneto-optical disc players; radios; portable multifunction stereo systems featuring stereo receivers, stereo tuners and stereo amplifiers; pre-recorded video DVDs, HD DVDs, MP3 discs, CD ROMs, videotapes, optical and magneto-optical discs, cassettes and computer interactive game programs all in the fields of surfing, skateboarding, snowboarding and active lifestyles in International Class 9;[5]

Registration No. 4077428 ('428 Reg.)
Entertainment, namely, live performances by musical bands, entertainment in the nature of theater and musical production; educational seminars in the field of surfing, skateboarding, skiing, snowboarding, soccer, field hockey, tennis, softball, golfing, sports competitions involving the foregoing sports, fashion design beauty pageants and topics of interest to women and girls; entertainment in the nature of on-going television programs in the field of surfing, skateboarding, skiing, snowboarding, soccer, field hockey, tennis, softball, golfing, sports competitions involving the foregoing sports, fashion design, beauty pageants and topics of interest to girls, boys, women and men; Education, namely, providing classes, seminars, workshops, and colloquiums in the field of sports training, sports training courses, fashion design and entertainment pertaining to sports; training in the field of sports, sporting competitions and fashion design; entertainment, namely, live performances by a musical band; organizing community sporting and cultural activities; teaching in the field of sports and sporting competitions and fashion design; publication of books and magazines; book lending in the nature of libraries; education and entertainment whatever the medium and especially via radio, television, teletext, computer and the Internet, namely, providing motivational speakers, providing continuing business education courses in the field of fashion shows, television show production, providing a continuing sports show broadcast over television, satellite,

---

[5] Issued January 19, 2010. Section 8 affidavit accepted.

audio and video media; entertainment in the nature of sporting, fashion design and beauty pageant competitions; organization of games via interactive audiovisual media or not; organization of sporting events, fashion design and beauty pageant competitions; rental of equipment for various sports with the exception of vehicles, namely, rental of golf equipment, tennis equipment, baseball equipment, roller skates, in-line roller skates, soccer equipment, surfboards, body boards, sail boards, kite boards, ski and snow board equipment; direction or presentation of plays and live shows, production of studio audio and video recordings, on the Internet; video tape editing; editing of radio and television programs; publication of texts, electronic and digital publications, namely, magazines, newsletters and journals in the fields of sports, sports science, fashion design, knowledge management, event management and fitness recreation, illustrated books, reviews, newspapers, periodicals and other printed matter other than advertising or publicity; electronic publication of text and graphic works of others on CDs and CD-ROMs featuring sports and sporting competitions; teaching and education in the nature of classes, seminars, workshops at beginner and advanced level in all sports and general interest disciplines, namely, sports and sporting competitions and fashion design; desktop publishing for others; arranging and conducting of educational colloquiums, seminars, and conferences; production, organization and presentation of shows, namely, fashion shows, beauty pageants, dogs shows, air shows, and sporting shows; sponsorship for cultural activities by means of computer networks, namely, sponsoring, development and carrying out international student exchange programs; granting of rewards and prizes, namely, providing recognition and incentives by the way of awards to demonstrate excellence in the field of sports, sporting competitions, fashion design and beauty pageants; entertainment, namely, film, video, video tape, and cartoon animation editing for third parties; entertainment services, namely, providing television programs in the field of cartoon animation, comedy, music, documentary, and science fiction, providing television miniseries in the field of cartoon, animation, comedy, music, documentary and science fiction, providing television sitcom variety shows, via a global computer network, satellite and audio and video media; publication of magazines and books in the field of education and entertainment; non-downloadable publications provided online, namely, magazines, newsletters and journals in the fields of sports, sports science, fashion design, knowledge management, event management and fitness recreation in International Class 41.[6]

---

[6] Issued December 27, 2011.

4

Petitioner Yazhong Investing Ltd., through its third amended petition for cancellation, seeks to cancel each of Respondent's registrations on grounds of fraud and abandonment. Petitioner also seeks to cancel the '628 Reg. and the '428 Reg. on the ground of nonuse.[7] In its answer, Respondent denied the salient allegations of the third amended petition to cancel.[8]

## I.  Description of the Record

The pleadings and, pursuant to Trademark Rule 2.122(b), 37 C.F.R. § 2.122(b), the files of the four registrations against which the petition to cancel was filed are of record.

### A.  Petitioner's Submissions

Petitioner filed the following evidence during trial:[9]

- Petitioner's First Notice of Reliance, 62 TTABVUE:

   o Certain of Petitioner's interrogatories, requests for admission and requests for production of documents and things, and Respondent's responses thereto;

- Petitioner's Second Notice of Reliance, 63-4 TTABVUE:

   o Printouts from the USPTO's Trademark Search and Document Retrieval (TSDR) database of assignment records, maintenance documents, notices of allowance, requests for extension of time to submit evidence of use, specimens and statements of use from the involved registrations and underlying applications;[10]

---

[7] 49 TTABVUE.

[8] 52 TTABVUE.

[9] The parties stipulated that all documents produced during discovery under Fed. R. Civ. P. 34 are authentic and may be made of record and relied upon in this proceeding. 61 TTABVUE.

[10] As noted above, these materials are automatically of record pursuant to Trademark Rule 2.122(b) and their introduction at trial was unnecessary.

- Petitioner's Third Notice of Reliance, 65 TTABVUE:

    o Printouts from the USPTO's TSDR database regarding Petitioner's five pleaded applications for the mark GIDGET, and Office Actions refusing registration of each under Section 2(d) of the Trademark Act, 15 U.S.C. § 1052(d), based upon a likelihood of confusion with the four challenged registrations:

- Petitioner's Fourth Notice of Reliance, 66 TTABVUE:

    o Portions of the record in this proceeding and copies from the USPTO's TSDR database of Respondent's challenged registrations;[11]

    o Declaration of Mr. Victor Valles, member of the Board for Gidget Marks, LLC and President of Gidget Worldwide, Inc. (GM/GWI), predecessors in interest to Respondent, with exhibits;

    o Portions of the discovery deposition of Mr. Kevin Powell, Chief Financial Officer and President of GM/GWI;

    o Copy of Stipulation for Entry of Judgment in prior litigation brought by Respondent against its predecessors in interest, including Victor Valles, Kevin Powell, Gidget Holdings, Inc. and GM/GWI;

- Petitioner's Fifth Notice of Reliance, 67 TTABVUE:

    o Complaint in litigation involving Respondent's predecessors in interest;

    o Purchase agreement regarding the marks in the involved registrations between Respondent's predecessors in interest;

    o Declaration of Mr. Michael DoBransky, a predecessor in interest to Respondent and plaintiff in litigation with other of Respondent's predecessors, in relation to their previous litigation, with exhibits;

    o Declarations of Mr. Javeed Matin, director of Respondent's predecessors in interest Veltex USA, Inc. and Wilshire Equity, Inc., in relation to previous litigation involving, *inter alia*, Respondent's predecessors;

- Declaration of Mr. David Dufek, attorney for Michael DoBransky in litigation against Veltex USA, Inc. and Wilshire Equity, Inc., with exhibits, 68

---

[11] Again, these materials are automatically of record pursuant to Trademark Rule 2.122(b) and their introduction at trial was unnecessary.

TTABVUE;

- Declaration of Mr. Anthony Grunstein, owner of Jet Int'l Holdings Ltd., a third-party consumer products distribution and manufacturing company, with exhibits, 69 and 71 TTABVUE;

- Declaration of Mr. Ron Yoshida, consultant and later Chief Executive Officer of GM/GWI, with exhibits, 70 TTABVUE;

- Declaration of Mr. Joe Annoni, corporate finance advisor to Anthony Grunstein and, subsequently, officer of Petitioner, with exhibits, 72-73 TTABVUE.

### B. Respondent's Submissions

During its trial period, Respondent did not introduce any testimony or other evidence.[12] Only Petitioner filed a brief.[13]

## II. Expiration of the '189 Reg.

On August 11, 2017, Respondent's '189 Reg. expired as to all classes of identified goods under Section 9 of the Trademark Act, 15 U.S.C. § 1059. When a registration that is the subject of a cancellation proceeding is abandoned or left to expire during the proceeding, such action is treated as an abandonment of the registration without the consent of the petitioner. Trademark Rule 2.134(b), 37 C.F.R. § 2.134(b). *See also*

---

[12] As we previously advised the parties, (48 TTABVUE 15 n.24), evidence submitted in connection with Petitioner's motions for summary judgment was of record only for consideration of those motions, unless properly introduced during the appropriate trial period. *Drive Trademark Holdings LP v. Inofin,* 83 USPQ2d 1433, 1438 n.14 (TTAB 2007); *Levi Strauss & Co. v. R. Josephs Sportswear Inc.,* 28 USPQ2d 1464 (TTAB 1993).

[13] Because Respondent, as defendant herein, is under no obligation to submit evidence or a brief, we do not construe Respondent's failure to do so as a concession of the case. *See. e.g.,* Trademark Board Manual of Procedure (TBMP) §§ 801.02(b) (June 2017). Petitioner must still prove its standing and grounds for cancellation by a preponderance of the evidence. *See, e.g., Cerveceria Centroamericana S.A. v. Cerveceria India Inc.*, 13 USPQ2d 892 F.2d 1021, 13 USPQ2d 1307, 1309-10 (Fed. Cir. 1989).

TBMP § 602.02(b). Typically, the Board would issue a show cause order to the respondent to indicate whether the expiration of the registration was purposeful or inadvertent. If purposeful, judgment is entered against the respondent as to that registration. If the expiration was inadvertent, the petitioner would be allowed time to indicate its intention to pursue its claim to final judgment. In this case, the '189 Reg. expired after Petitioner filed its brief on the merits. Because the proceeding was tried and briefed as to all four of the involved registrations, we see no reason to delay determination thereof on the merits, and proceed to final judgment on all four registrations, including this one. *See Blackhorse v. Pro-Football, Inc.*, 111 USPQ2d 1080, 1083, n.7 (TTAB 2014), *aff'd*, 112 F.Supp.3d 439, 115 USPQ2d 1524 (E.D.Va. 2015), *vacated and remanded on other grounds*, No. 15-1874 (4th Cir. Jan. 18, 2018).

## III. Respondent's Motion to Amend Registrations

On February 11, 2016, Respondent filed Section 7, 15 U.S.C. § 1057, requests in the post-registration files of its '628 and '428 Regs. seeking to delete numerous goods and services from each registration. In the Board's April 14, 2016 decision, *inter alia*, denying Petitioner's renewed motion for summary judgment, Respondent was advised that because these registrations are subject to this cancellation proceeding, Respondent's filing of Section 7 requests with the Trademark Post-Registration Division of the USPTO, rather than filing a motion to amend with the Board, was procedurally improper.[14] *See Hachette Filipacchi Presse v. Elle Belle LLC*, 85 USPQ2d 1090, 1095

---

[14] 48 TTABVUE 8-10.

(TTAB 2007) (Board has jurisdiction to determine propriety of amendment to a registration involved in a Board proceeding).[15] Respondent was allowed time to file an appropriate motion with the Board to amend its involved '628 and '428 Regs.[16] Thereafter, on May 4, 2016, Respondent filed a motion pursuant to Trademark Rule 2.133, 37 C.F.R. § 2.133, to amend the respective goods and services in all four of its involved registrations.[17]

However, under Trademark Rule 2.173(b), 37 C.F.R. § 2.173(b), a request to amend an involved registration must, *inter alia*, include the fee required by Trademark Rule 2.6(a)(11), 37 C.F.R. § 2.6(a)(11). *See* TBMP § 514.01 and authorities cited therein. On May 17, 2016, the Board issued an interlocutory order: indicating that because Respondent's motion to amend was not accompanied by the required fee, it would receive no consideration; accepting the withdrawal of Respondent's counsel; and allowing Respondent time in which to appoint new counsel or indicate that it would represent itself.[18] Respondent's notice of appearance, indicating it would represent itself, did not address its failure to submit the required fee with its motion to amend.[19] Nor did Respondent subsequently submit the required fee or otherwise address this deficiency. Accordingly, Respondent's motion to amend has been given no

---

[15] On April 26, 2016, the Trademark Post-Registration Division of the USPTO issued Office Actions denying Respondent's Section 7 amendments and indicated that any fees submitted with the requests would be refunded in due course.

[16] 48 TTABVUE 8-10, 16-7.

[17] 51 TTABVUE.

[18] 54 TTABVUE 1.

[19] 56 TTABVUE 2.

Cancellation No. 92056548

further consideration.

## IV. Discussion

### A. Standing

To establish its standing, Petitioner must prove that it has a "real interest," i.e., a "reasonable" basis for its belief of damage. *See Empresa Cubana Del Tabaco v. Gen. Cigar Co.,* 753 F.3d 1270, 111 USPQ2d 1058, 1062 (Fed. Cir. 2014); *Ritchie v. Simpson*, 170 F.3d 1092, 50 USPQ2d 1023, 1025 (Fed. Cir. 1999); *Lipton Indus., Inc. v. Ralston Purina Co.*, 670 F.2d 1024, 213 USPQ 185, 189 (TTAB 1982). We find that Petitioner has adequately established a real interest in this proceeding through its evidence that it filed five intent-to-use trademark applications with the USPTO for the mark GIDGET for a variety of goods and services in International Classes 9, 18, 24, 25 and 41, and that the Office issued a refusal to register each application based on likelihood of confusion with Respondent's subject registrations under Section 2(d).[20] *See SaddleSprings Inc. v. Mad Croc Brands Inc.*, 104 USPQ2d 1948, 1950 (TTAB 2012) (standing supported by allegation that petitioner's intent-to-use application has been refused based on respondent's registrations); *ShutEmDown Sports Inc. v. Lacy*, 102 USPQ2d 1036, 1043 (TTAB 2012) (standing shown by evidence that plaintiff's application was refused registration in view of defendant's registration); *Fiat Grp. Autos. S.p.A. v. ISM Inc.*, 94 USPQ2d 1111, 1112 (TTAB 2010) (the filing of opposer's application and the Office's action taken in regard to that application provide opposer with a basis for pleading its standing).

---

[20] 49 TTABVUE 2-8; 65 TTABVUE 5-58.

10

## B. Abandonment

### 1. Statement of the Law of Abandonment

The Trademark Act provides for the cancellation of a registration if the registered mark has been abandoned. *See* Section 14 of the Trademark Act, 15 U.S.C. § 1064. Under Section 45 of the Trademark Act, 15 U.S.C. § 1127, a mark is considered abandoned when "its use has been discontinued with intent not to resume such use." The definition of abandonment is found in this provision, as follows:

> A mark shall be deemed to be "abandoned" if either of the following occurs:
>
> (1) When its use has been discontinued with intent not to resume such use. Intent not to resume may be inferred from circumstances. Nonuse for 3 consecutive years shall be prima facie evidence of abandonment. "Use" of a mark means the bona fide use of such mark made in the ordinary course of trade, and not made merely to reserve a right in a mark.
> …

15 U.S.C. § 1127.

Because registrations are presumed valid under the law, the party seeking their cancellation bears the burden of proving a prima facie case of abandonment by a preponderance of the evidence. *See On-Line Careline Inc. v. America Online Inc.*, 229 F.3d 1080, 56 USPQ2d 1471, 1476 (Fed. Cir. 2000); *Cerveceria Centroamericana S.A. v. Cerveceria India Inc.*, 13 USPQ2d at 1309; *Exec. Coach Builders, Inc. v. SPV Coach Co.*, 123 USPQ2d 1175, 1180-81 (TTAB 2016). If the petitioner presents a prima facie case of abandonment, the burden of production, i.e., going forward, then shifts to the trademark holder to rebut the prima facie showing with evidence. *Id.* at 1311.

Abandonment is a question of fact. *See Stock Pot Rest., Inc. v. Stockpot, Inc.*, 737 F.2d 1576, 222 USPQ 665, 667 (Fed. Cir. 1984). Thus, any inference of abandonment

must be based on proven fact. Section 45 of the Trademark Act. *See also Cerveceria Centroamericana S.A. v. Cerveceria India Inc.,* 13 USPQ2d at 1310 ("The protection due the registrant is provided by requiring that the inference have an adequate foundation in proven fact. Whenever an inference is based on pure speculation and 'there is no basis ... to *infer* nonuse,' a prima facie case of abandonment must fail.") (quoting *P.A.B. Produits et Appareils de Beaute v. Satinine Societa in Nome Collettivo di S.A. e. M. Usellini,* 570 F.2d 328, 332-33, 196 USPQ 801, 804-05 (CCPA 1978)); *Stetson v. Howard D. Wolf & Assoc's,* 955 F.2d 847, 21 USPQ2d 1783, 1785 (2d Cir. 1992) (A party claiming that a mark has been abandoned must show "non-use of the mark by the legal owner and no intent by that person or entity to resume use."). Proof of nonuse for three consecutive years, however, constitutes prima facie evidence of abandonment, because it supports an inference of lack of intent to resume use. Section 45 of the Trademark Act. *See also On-line Careline Inc. v. America Online Inc.,* 56 USPQ2d at 1476 ("The party seeking cancellation establishes a prima facie case of abandonment by showing proof of nonuse for three consecutive years."); *Emergency One, Inc. v. American FireEagle, Ltd.,* 228 F.3d 531, 56 USPQ2d 1343 (4th Cir. 2000).

### 2. Evidence of Abandonment

We begin with Figure 1, below, a chart submitted under the declaration testimony of Joe Annoni outlining the various owners of the GIDGET marks at issue. "MMTV" is Respondent.[21]

---

[21] 72 TTABVUE 13.

**Summary of Gidget-Related Companies from 2005-2012**

Gidget Int'l Inc (GII) • M. DoBransky: Owner

Veltex Corp. • J. Matin: CEO • V. Valles: VP Marketing

MMTV & related shell companies • R. Paxson: Owner • D. Nelson: Operations

Gidget Holdings Inc (GHI) • V. Valles: President • R. Paxson: Treasurer/CFO

Gidget Marks LLC & Gidget Worldwide Inc (GM/GWI) • V. Valles: President • K. Powell: CFO/COO • D. Nelson: Treasurer

**The Veltex Period: 2005-2007**

- 12/30/04: Mr. DoBransky (GII) sells TMs to Veltex
- Jul'05-Nov'06: TM Reg# 3197189 filed by Mr. DoBransky
- Dec'06: TM Reg# 2093572 Renewal filed by Mr. DoBransky
- Jan'07: TM Reg# 3234890 filed by Mr. DoBransky

**The MMTV/GHI Period: 2008**

- 05/01/08: Letter of Intent (LOI) for Veltex to sell TMs to MMTV/GHI
- 05/29//30: GII buys TMs from Veltex
- 05/30/08: LOI for GII to sell TMs to MMTV/GHI

**The GM/GWI Period: 2008-2012**

- 07/30/08: GII sells TMs to GM/GWI
- Nov'08: GII assigns TMs to GM/GWI
- Dec'09: TM Reg# 3740628 filed by GM
- '09-'10: TM Ser# 77726529 filed by GM
- Nov'11: TM Reg #4077428 filed by GM
- Dec '12: GM assigns TM to MMTV
- Jan'13: TM Reg #3197189 Renewal filed by Mr. Valles

NOTES:
- Buying/selling of TMs
- TM registrations

Figure 1.

In response to Petitioner's discovery requests, Respondent indicates as follows:

- Respondent and its predecessors have made continuous use of the GIDGET marks from 2005 through 2012 in various states and foreign territories, including Hawaii, Florida and California.[22]

- In response to Petitioner's request for the annual number of units of sales in the United States for each item of goods and each of the services identified in its four registrations, Respondent indicates that "it does not presently have in its possession, custody or control, information regarding the annual number of unit sales."[23]

---

[22] 62 TTABVUE 48-9; 57-8.

[23] *Id.* at 12-13.

- Respondent further indicates that it has produced or will produce documents in response to several of Petitioner's discovery requests regarding its use of the GIDGET marks in the involved registrations; however, no such documents are of record.[24]

In his declaration, Mr. Victor Valles, President and CEO/member of the Board of GWI/GM, declares as follows:

- as President of GWI, he "actively sought licensees for the GIDGET mark, negotiated discussions with third parties regarding licensing of the mark, and oversaw the activities of our licensees."[25]
- Respondent's predecessors "made continuous efforts to advertise, promote and expand the GIDGET brand through various efforts such as participating in tradeshows, seeking licensing partners, sponsoring community and sporting events, and advertising in magazines and journals."[26]

Mr. Valles made the following statements with regard to each individual registration:

<u>('572 Reg.)</u>
- When Gidget Marks acquired the '572 Reg. in 2008, there was use of the GIDGET mark in connection with the identified goods;
- When Gidget Marks owned the '572 Reg. from 2008 until 2011, there was continuous use of the mark on the identified goods;
- At no time was there any intent to abandon the '572 Reg.[27]

<u>('027 Reg.)</u>
- In December 2009, Gidget Marks' attorney filed a statement of use for the '027 Reg.;
- When Gidget Marks filed the Statement of Use, Mr. Valles was not aware that it was necessary to use the GIDGET mark on each of the goods in the '027 Reg., but mistakenly believed that the mark only needed to be in use on one of the identified goods;
- Mr. Valles was not aware of his obligation to delete the identified goods that were not in use at the time of filing the Statement of Use;

---

[24] *Id*. at 79-87, 108-119.

[25] 66 TTABVUE 33.

[26] *Id*.

[27] *Id*. at 34.

14

- Mr. Valles believed that licensing or offering to license the identified goods was sufficient use to support filing the Statement of Use;
- Mr. Valles' mistaken beliefs were based upon a misunderstanding of trademark law and misunderstanding of counsel's instructions;
- At no point did Mr. Valles intend to deceive the Trademark Office;
- During the time Gidget Marks owned the '027 Reg. from 2008 until 2011, there was continuous use of the GIDGET mark on the identified goods through licensing contracts with third parties;
- At no time was there any intent to abandon the '027 Reg.[28]

('189 Reg.)
- When Gidget Marks acquired the '189 Reg. in 2008, there was use of the GIDGET mark in connection with the identified goods through licensing contracts with third parties;
- After acquiring the '189 Reg., Mr. Valles made continuous efforts to license use of the GIDGET mark on the identified goods;
- During the time Gidget Marks owned the '189 Reg. from 2008 until 2011, there was continuous use of the GIDGET mark on the identified goods;
- At no time was there any intent to abandon the '189 Reg.[29]

('428 Reg.)
- In April 2011, Gidget Marks' attorney filed a statement of use for the '428 Reg.;
- The Statement of Use was supported by a specimen consisting of a DVD case which was an accurate representation of the DVD that Gidget Marks was distributing at the time;
- The substitute specimen filed with the Statement of Use was a brochure advertising GIDGET branded educational seminars that was distributed to potential licensees and tradeshows;
- When the Statement of Use was filed, Mr. Valles was not aware that it was necessary to use the GIDGET mark on each of the services in the '428 Reg., but mistakenly believed that the mark only needed to be in use in connection with one of the identified services;
- Mr. Valles was not aware of his obligation to delete the identified services that were not in use at the time of filing the Statement of Use;
- Mr. Valles believed that licensing or offering to license the identified services was sufficient use to support filing the Statement of Use;
- Mr. Valles' mistaken beliefs were based upon a misunderstanding of trademark law and misunderstanding of counsel's instructions;
- At no point did Mr. Valles intend to deceive the Trademark Office;

---

[28] *Id.* at 34-5.

[29] *Id.* at 35.

- At the time of filing of the Statement of Use for the '428 Reg., there was use of the GIDGET mark in connection with various services through licensing contracts with third parties;
- During the time Gidget Marks owned the '428 Reg. from 2008 until 2011, there was continuous use of the GIDGET mark in connection with the identified services;
- At no time was there any intent to abandon the '428 Reg.[30]

In his discovery deposition from prior litigation involving Respondent and, *inter alia*, its predecessors in interest, Mr. Kevin Powell, President/Chief Financial Officer of GWI/GM, testified as follows:

- as of 2010, no products had been sold under the GIDGET mark anywhere in the world;
- all of the money GWI received to that point was for advances based upon anticipated revenues;
- aside from some samples, there are no products bearing the GIDGET mark in any stores, and no agreements relating to use of the GIDGET marks for entertainment services;
- since its formation, GM has not raised any capital or filed any tax returns.[31]

In his declaration in support of his motion for enforcement of settlement agreement, Mr. Michael DoBransky, one of Respondent's predecessors and plaintiff in litigation with other of Respondent's predecessors, declares as follows:

- from September 2006 to at least October 2006, he acted as a consultant to Mr. Javeed Matin, director of Respondent's predecessors in interest Veltex USA, Inc. and Wilshire Equity, Inc.;
- Mr. Matin instructed him to find an individual to perform licensing services;
- Mr. DoBransky contacted numerous individuals for purposes of performing licensing services;
- despite repeated requests, neither Mr. Matin nor anyone else informed him of the budget for licensing, promotions or advertising;

---

[30] *Id*. at 36-7.

[31] *Id*. at 73-82.

16

- as a result, Mr. DoBransky was never able to commit to any of the numerous advertising or promotional offers he was presented.[32]

In his declaration in support of his opposition to Mr. DoBransky's motion for summary judgment in the same litigation, Mr. Javeed Matin declares as follows:

- Mr. DoBransky falsely stated that rights to the GIDGET marks were generating several million dollars annually, that a major studio would release a GIDGET motion picture in 2005, and that a major television network was starting a Saturday morning GIDGET cartoon in 2005;
- Mr. DoBransky falsely stated that Mr. Matin and his fellow defendants would begin receiving funds from these activities after entering into a contract with DoBransky;
- rights to the GIDGET marks have generated no sales of any goods as of 2006.[33]

In his declaration, Mr. Anthony Grunstein, owner of a third-party consumer products distribution and manufacturing company Jet International Holdings Ltd., declares as follows:

- in 2011, he was contacted by Mr. Victor Valles and Mr. Kevin Powell of GWI/GM, then owners of the GIDGET marks in the registrations at issue, to act as distributor for GIDGET branded products in Australia, New Zealand, and Asia (excluding Japan);
- in response to his request for disclosure of products, sales and marketing activities related to goods under the GIDGET mark, he was informed that as of 2011, there has been no manufacturing or sale of GIDGET marked goods or provision of any services;
- in addition, there were no manufacturing relationships in place, no technical design packs to manufacture the goods, or marketing collateral to market the goods;
- Jet began designing products, developing product samples and prototypes, and creating mockup catalogs of products for prospective clients;
- in response to an investment pitch by GWI/GM, Mr. Grunstein and other potential investors exercised due diligence by demanding full disclosure of all GIDGET related activities including financial, corporate and legal activities;
- with the cooperation of GWI/GM and their counsel, Mr. Grunstein and

---

[32] 67 TTABVUE 24-46.

[33] *Id*. at 47-54.

17

other potential investors reviewed financial records from 2008 through mid-2012 and prepared documents therefrom confirming that there was no sale of any GIDGET branded product or service, and no related manufacturing, advertising or promotional expenditures during that time;

- the mockup sample catalog Jet created was used as a specimen of record in the '189 Reg.;
- Jet did not give GWI/GM permission to use its mockups or prototypes as specimens of use;
- none of the products in the mockup catalog were ever manufactured or made available for sale.[34]

In his declaration, Mr. Ron Yoshida, consumer products industry executive and consultant, declares as follows:

- in mid-2010, Mr. Victor Valles and Mr. Kevin Powell requested Mr. Yoshida to be a consultant for their business related to the GIDGET marks;
- GWI/GM did not, at that time, have a consumer products business and were looking for someone to exploit the GIDGET marks;
- over the next year he set up meetings for Mr. Valles and Mr. Powell with industry contacts based upon their representations that they had an entertainment deal for a GIDGET movie or television program;
- Mr. Valles and Mr. Powell encouraged Mr. Yoshida, his contacts and others to invest in their business;
- in late 2011 Mr. Yoshida and other potential investors and advisors grew frustrated with the lack of transparency from Mr. Powell and Mr. Valles and began researching their business practices and claims;
- in March 2012, Mr. Powell and Mr. Valles appointed Mr. Yoshida as Chief Executive Officer of GWI/GM and constructed a Board of Directors to salvage the business;
- Mr. Yoshida oversaw an audit of the companies and personally reviewed their finances, management and business plan with respect to their sole asset, the GIDGET marks;
- he learned from the audit that the companies' officers had significantly misled investors regarding the status of the business, as well as the validity and value of the GIDGET brand, and misused investments;
- upon reviewing the corporate and financial records, Mr. Yoshida determined that the officers of the businesses were not running a proper business and were using investors' funds for personal gain;
- in October 2012, Mr. Powell was removed by the Board of Directors based upon multiple findings of misconduct;
- based upon his role as consultant and Chief Executive Officer, Mr. Yoshida

---

[34] 69 TTABVUE 1-98.

determined that from 2009 through 2012 GWI/GM did not manufacture, sell, or offer for sale any GIDGET branded product or service, nor were there any funds for manufacturing;

- from 2008-2012, GWI/GM did not generate any revenue for any GIDGET branded products;
- since late 2012, Mr. Yoshida had no further involvement with the GIDGET marks-related businesses.[35]
- Mr. Yoshida also declared in conclusion that "the only business mission the company pursued at that time, was to defraud investors."[36]

In his declaration, Mr. Joe Annoni, a management and investment consultant and, subsequently, an officer of Petitioner, declares as follows:

- in January 2012, he was introduced by Mr. Yoshida to Mr. Valles, Mr. Powell and Mr. Grunstein;
- he was asked by Mr. Grunstein to serve as a corporate finance advisor to conduct a due diligence assessment of GWI/GM;
- in January 2012, Mr. Grunstein and GWI/GM provided him with a copy of GWI/GM's investment proposal;
- in March 2012, GWI/GM produced financial documents;
- upon reviewing these documents, Mr. Yoshida concluded that GWI/GM did not possess any capital commitments, had not developed any products or services under the GIDGET mark between 2008 and mid-2012, and did not have any licensing relationships or receive any licensing revenue or licensing advances;
- GWI/GM had no manufacturing or advertising or promotional expenses during this time;
- upon further meetings with Respondent, its predecessors and principals from each of these companies as well as review of documents relating thereto, Mr. Yoshida concluded that there were no bona fide sales, manufacturing or development of any GIDGET branded goods or services from at least 2004 until mid-2012.[37]

### 3. Findings of Fact

Neither party addresses use of the mark in connection with the identified goods

---

[35] 70 TTABVUE 1-5.

[36] *Id*. at 5.

[37] 72 TTABVUE 2-8.

or services prior to 2004. Therefore, Petitioner has not established a prima facie case of abandonment prior to that period.[38] As a result, the issue before us is whether Petitioner has established that Respondent abandoned its mark, as abandonment is defined in the law, during the period from 2004 to the middle of 2012.

As discussed above, Mr. Javeed Matin, officer of Respondent's predecessor Veltex USA, Inc. and Wilshire Equity, Inc., declared that as of 2006, there were no sales of GIDGET-branded goods.[39] Mr. Kevin Powell, officer of Respondent's predecessor GWI/GM, testified that as of 2010, no products had been sold under the GIDGET mark anywhere in the world.[40] Mr. Anthony Grunstein, owner of a third-party con-sumer products manufacturing company hired to design, develop and manufacture the products to be offered for sale under the GIDGET mark, declared that from 2008 through mid-2012, there was no sale of any GIDGET-branded product or service, and no manufacturing, advertising or promotional expenditures related thereto.[41] Mr. Grunstein further declared that his company created a sample, mockup catalog that was used by Respondent's predecessor as the specimen of use underlying the '189 Reg., and that none of the products in the mockup catalog were ever manufactured or made available for sale.[42] Mr. Ron Yoshida, consumer products industry consultant

---

[38] The '428 and '628 Regs. do not even assert use prior to June 2009 and March 2009, respec-tively.

[39] 67 TTABVUE 47-54.

[40] 66 TTABVUE 73-82.

[41] 69 TTABVUE 1-98.

[42] *Id*. While not before us in this case, we note as a general matter that mockup catalogs are

and later officer of Respondent's predecessor GWI/GM, declared that from 2009 through 2012 GWI/GM did not manufacture, sell, or offer for sale any GIDGET branded product or service, nor were there any available funds for manufacturing.[43] Mr. Yoshida further declared that from 2008-2012, GWI/GM did not generate any revenue from any GIDGET branded products.[44] In his declaration, Mr. Joe Annoni, management and investment consultant and subsequently officer of Petitioner, corroborates Mr. Grunstein's and Mr. Yoshida's declarations. [45]

The evidence of record, consisting largely of the testimony of officers of Respondent's predecessors in interest and third parties who were retained by them, establishes that from at least 2008 through 2012, there was no use of the GIDGET mark in the ordinary course of trade in relation to any of the goods or services recited in the involved registrations. The testimony depositions and declarations are consistent and corroborate one another. Taken together, this evidence establishes Petitioner's prima facie case of abandonment based on at least three consecutive years of nonuse. Thus, the burden of going forward and rebutting the prima facie showing, with evidence, shifts to Respondent.

The statement by Mr. Valles in his declaration that Respondent's predecessor

---

not proper specimens of use because they do not demonstrate actual use of the mark in commerce. *See* Section 1(d), 15 U.S.C. § 1051(d) ("specimens or facsimiles of the mark as used in commerce"); Section 45, 15 U.S.C. § 1127 ("'use in commerce means the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark.'").

[43] 70 TTABVUE 1-5.

[44] *Id.*

[45] 72 TTABVUE 2-8.

GWI/GM never had an intention to abandon the mark is of little importance. For the intent element of abandonment under the Trademark Act, the relevant question is not whether Respondent intended to abandon the mark, but whether or not it intended to resume use. *See Imperial Tobacco Ltd. v. Philip Morris Inc.*, 899 F.2d 1575, 14 USPQ2d 1390, 1394 (Fed. Cir. 1990) ("In every contested abandonment case, the respondent denies an intention to abandon its mark; otherwise there would be no contest."); *see also Cerveceria Modelo S.A. de C.V. v. R.B. Marco & Sons Inc.*, 55 USPQ2d 1298, 1303 (TTAB 2000). Thus, to support a finding of intent to resume use of the mark, the owner must do more than simply assert a vague, unsubstantiated intent to make use of the mark at some unspecified time in the future. Rather, the owner must build a record "with respect to what activities it engaged in during the nonuse period or what outside events occurred from which an intent to resume use during the nonuse period may reasonably be inferred." *Imperial Tobacco Ltd. v. Philip Morris Inc.*, 14 USPQ2d at 1394.

In response to Petitioner's discovery requests, Respondent asserts that it and its predecessors have made continuous use of the GIDGET mark from 2005 through 2012.[46] However, Respondent further asserts that "it does not presently have in its possession, custody or control, information regarding the annual number of unit sales"[47] with regard to such use. Respondent also asserts that it has produced or will

---

[46] 62 TTABVUE 48-9; 47-8.

[47] *Id*. at 12-13.

produce documents supporting its use of the GIDGET mark in the involved registrations; however, no such documents are in the record.[48]

Mr. Valles declared that when GWI/GM acquired the GIDGET mark in the involved registrations in 2008, the mark was in use and remained in continuous use from 2008 through 2011.[49] However, Respondent has not introduced any evidence of such use. Furthermore, Mr. Valles' declaration is directly contradicted by the testimony declarations of his fellow officers at GWI/GM, Mr. Powell and Mr. Yoshida, as well as the testimony of other individuals associated with Respondent and its predecessors as discussed above. Mr. Valles further declares that he and Respondent's predecessors "made continuous efforts to advertise, promote and license the GIDGET mark through such activities as participating in tradeshows, seeking licensing partners, sponsoring community and sporting events, and advertising in magazines and journals."[50] However, Respondent cannot rely upon mostly unsubstantiated assertions of vaguely defined efforts, apparently conducted without an operating budget, to license goods and services in order to keep someone else from adopting a mark it has abandoned. *See Gen. Motors Corp. v. Aristide & Co., Antiquaire de Marques*, 87 USPQ2d 1179, 1183 (TTAB 2008); *Hornby v. TJX Cos. Inc.*, 87 USPQ2d 1411, 1421 (TTAB 2008). *See also Emergency One Inc. v. Am. FireEagle Ltd.*, 56 USPQ2d at 1348 ("Once the challenger shows discontinued use, the owner must produce evidence of

---

[48] *Id.* at 79-87, 108-119.

[49] 66 TTABVUE 33-7.

[50] *Id.*

intent to resume use 'within the reasonably foreseeable future.' … Of course, what is meant by the 'reasonably foreseeable future' will vary depending on the industry and the particular circumstances of the case … it might be reasonable for a fire truck manufacturer to spend five or six years considering the reintroduction of a brand, even though the same passage of time would be unreasonable for a maker of a more ephemeral product, say potato chips."). While production and distribution of a motion picture may be an expensive and time-consuming process, manufacture and distribution of consumer goods such as clothing, bicycles and paper products may be effected much more easily. However, there is no evidence that Respondent or its predecessors produced or sold any consumer products under the GIDGET mark from at least 2008 through 2012, aside from a few prototypes created by a third party. Further, despite representations that the theatrical release of a GIDGET movie and cartoon series was imminent as of 2005,[51] there is no evidence of any such movie or program. Simply put, there is no credible evidence that Respondent or its predecessors made any use of the GIDGET mark apart from a few sporadic promotions of surfing events – which activity is not listed among the goods or services identified in the subject registrations – and vaguely described, unsuccessful attempts at licensing the GIDGET mark in connection with its numerous identified goods and services.

Upon close and careful consideration of the attempts of Respondent and its predecessors to license the mark, we find that the vaguely explained attempts, both in-

---

[51] 67 TTABVUE 47-54.

dividually and collectively, fall far short of rebutting the presumption of abandonment. All of the other activities engaged in by Respondent and its predecessors, which effectively added up to little more than attempts to secure additional investors, do not establish an intent to resume use during the critical time frame from at least 2008 through 2012. The evidence in this case does not show serious negotiations toward execution of any license agreement. Respondent's efforts were neither consistent nor sustained, and assertions of discussions concerning the potential use of the mark at some unknown point in the future are insufficient to show an intent to resume use. *Rivard v. Linville*, 133 F.3d 1446, 45 USPQ2d 1374, 1376-77 (Fed. Cir. 1998); *Imperial Tobacco Ltd. v. Philip Morris Inc.*, 14 USPQ2d at 1396; *Azeka Bldg. Corp. v. Azeka*, 122 USPQ2d 1477, 1487-88 (TTAB 2017); *Auburn Farms Inc. v. McKee Foods Corp.*, 51 USPQ2d 1439, 1443-45 (TTAB 1999). *See also Emergency One Inc. v. Am. FireEagle Ltd.*, 56 USPQ2d at 1347-48 ("Requiring the owner to have an intent to use the mark in the reasonably foreseeable future ensures that valuable trademarks are in fact used in commerce as the Lanham Act intends, rather than simply hoarded or warehoused.").

Quite simply, the record is devoid of any evidence showing a specific and consistent plan to resume use – to the extent Respondent ever used the GIDGET mark – during a period of at least four years from 2008 through 2012. *See Hornby v. TJX Cos. Inc.*, 87 USPQ2d at 1421 ("Petitioner has not provided any excuse or indeed any reason at all for this long period of nonuse, nor has she provided any evidence about her plans to resume use of the mark … 'Use' of a mark means 'the bona fide use of

such mark made in the ordinary course of trade, and not made merely to reserve a right in a mark.'").

Accordingly, we conclude that the GIDGET mark in Respondent's involved registrations is abandoned, that is, there has been nonuse from at least 2008 through 2012 with no intent to resume use.

## C. Summary

Considering all of the evidence of record, including any evidence not specifically discussed herein, we find that Petitioner has proven its standing and Respondent's abandonment of the GIDGET mark as to all of the goods and services in Respondent's four challenged registrations, and that Respondent has failed to demonstrate either specific activities undertaken during the period of nonuse or special circumstances which negate an intent not to resume use or excuse nonuse as to those goods and services. We find by a preponderance of the evidence that the mark in each challenged registration has been abandoned. 15 U.S.C. § 1127. In view thereof, we do not reach the other grounds for cancellation.[52]

Decision: The petition to cancel is granted as to all four registrations.

---

[52] "Like the federal courts, the Board has generally used its discretion to decide only those claims necessary to enter judgment and dispose of the case. … More specifically, the Board's determination of registrability does not require, in every instance, decision on every pleaded claim." *Multisorb Tech., Inc. v. Pactiv Corp.*, 109 USPQ2d 1170, 1171 (TTAB 2013).